OPINION OF THE COURT
Arthur J. Cooperman, J.
Plaintiff seeks recovery from defendants of the sum of $6,300 representing the price of two used forklift trucks that plaintiff contends it traded in to defendant Clark Lift upon plaintiff’s acquisition of a new forklift unit, pursuant to a lease-sale arrangement entered into by the parties.
Plaintiff had discontinued its cause of action against defendant Montgomery Leasing Corp. prior to trial.
Defendant counterclaims for the sum of $2,500 representing repairs it made upon the used machines and storage charges therefor.
This case involves the application of the Uniform Commercial Code to a trade-in transaction that appears to lack decisional antecedents.
Upon the trial of this matter, without a jury, the facts not subject to dispute were as follows: On May 7, 1979, defendant, a forklift dealer, conducted a special sales drive *592 of its equipment as a result of which its sales representative presented himself at plaintiff’s business office. Due to the sales representative’s efforts, plaintiff, a metal-stamping company, agreed to acquire through a lease-purchase arrangement a new 4,000 pound forklift truck.
At that time, plaintiff’s vice-president expressed a desire to trade in two used Clark units that were on the plaintiff’s premises. Following an inspection of the used machines by the sales representative a trade-in allowance of $6,300 was assigned to them.
A written “Quotation” was signed by plaintiff’s vice-president and defendant’s salesman. The quotation referred to a new Clark 4,000 pound unit; a price of $16,800; a trade-in allowance on “2 Clarks” (with the serial numbers indicated) of $6,300, and a notation that a five-year lease with option to buy was applicable to the new unit. The quotation also bore the following printed statement: “This Quotation shall become a contract upon signature by an Officer of Seller at its business offices.” The defendant never presented to plaintiff a copy of the quotation signed by an officer authorized to accept the sale.
On June 12, 1979, plaintiff leased from Montgomery Leasing Corp. a new 4,000 pound Clark forklift truck. The machine had been purchased from defendant and leased to plaintiff by Montgomery, which, in effect, financed the acquisition.
Thereafter, on June 14, 1979, defendant delivered the new machine.
In mid August, 1979, defendant picked up from plaintiff the two machines that are the subject of this lawsuit.
The pick-up order form provided by the defendant to its truck driver contained the name of the plaintiff, its place of business and the serial numbers of the two used machines listed on the quotation. The space provided for indicating whether the equipment was being traded in was marked with an “X”.
Plaintiff’s vice-president then wrote to defendant requesting payment of $6,300 for the two used machines pursuant to the quotation signed by him and the defen *593 dant’s sales representative. Defendant responded by letter dated September 13,1979 offering to purchase the units for $1,800 each, “based on the present condition.”
In its complaint, plaintiff alleged that having performed all the conditions contained in the instrument dated May 7,1979, it was entitled to the $6,300 trade-in allowance on the two used machines.
Defendant’s answer denied the substantive allegations of the complaint and set forth three affirmative defenses, to wit: (1) that the instrument that is the subject of this lawsuit concerned the sale of goods for a price in excess of $500 and, therefore, was required to be signed by defendant or its lawful agent; (2) that the two used units were falsely represented to weigh 8,000 pounds, when, in fact, they weighed 7,000 pounds; and (3) that when plaintiff purchased the new forklift truck on June 14, 1979, it did not offer its two used machines to defendant for a trade-in allowance, and did not do so until August 22,1979 at which time they were in a different mechanical condition, were not operating and required extensive repairs.
The answer also set forth a counterclaim for repairs defendant made on the units between August 22,1979 and November 27, 1979.
Upon the trial, plaintiff’s vice-president Andrew Albanese testified that when he signed the quotation he was told that the new forklift would be delivered within six weeks, at which time the used machines would be picked up. He testified that when the new unit was delivered on June 14, 1979 he instructed the driver to take the two exchange trucks. The driver refused on the ground that he had no room in his truck. However, he assured Mr. Albanese that he would return.
On cross-examination Mr. Albanese acknowledged that, although defendant had offered $6,300 for his used machines, the defendant’s sales representative had no objection to his seeking a better price from another buyer. The witness testified that he placed an advertisement in a newspaper and received several offers for the machines, but none was as good as defendant’s. Accordingly, on June 14, 1979, when the new forklift was delivered, he wanted defendant to pick up the used units.
*594 The defendant’s secretary-treasurer testified that on the special sale day of May 7,1979 he received a telephone call from the sales representative who told him that the trade-in machines were in excellent running condition. The witness testified that he evaluated the machines at $3,150 apiece and so advised the sales representative. He further testified that when the two used units were eventually picked up to be inspected and estimated by defendant during the following August, the engines were seized. At that time the machines were re-evaluated at $1,800 each and plaintiff was so advised of the new offer.
The sales representative’s testimony essentially confirmed the plaintiff’s chief witness as to the events of the special sale day. He further testified that he examined both trade-in machines, found them to be in running order (one of which he saw being operated) and telephoned his evaluation to his superior. Additionally, he testified that Mr. Albanese was told that, while he was free to seek a better deal on the used machines, a final decision had to be made prior to the signing of any lease papers for the new Clark lift unit.
Defendant’s first affirmative defense invokes the Statute of Frauds contained in section 2-201 of the Uniform Commercial Code, which, in pertinent part, states: “(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.”
In view of the printed notice on the quotation that the paper was not a contract, absent a subsequent signature by an officer of the seller, the foregoing statutory prohibition pertains herein, unless one of its exceptions can be applied.
Section 2-201 further provides, as follows:
“(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable * * *
*595 “(c) with respect to goods for which payment has been made and accepted or which have been received and accepted (Section 2-606).”
What constitutes acceptance is set forth in section 2-6Q6 of the Uniform Commercial Code as follows:
“(1) Acceptance of goods occurs when the buyer * * *
“(c) does any act inconsistent with the seller’s ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.”
Defendant’s reliance upon subdivision (1) of section 2-201 of the Uniform Commercial Code is mixed with its contention that a trade-in simply did not occur. The evidence presented does not permit such a finding. The sales representative conducted his own inspection and evaluation of the used machines at the same time that he was attempting to seal a deal with plaintiff on a new forklift truck. Either the used units depreciated 57% within three months from inspection to pickup or the defendant’s salesperson allowed his eagerness to close a deal on the special sale day to interfere with his ability to evaluate.
In any event, this court finds that defendant and plaintiff intended a trade-in with a $6,300 allowance. The court credits plaintiff’s version of the events surrounding the failure of defendant to pick up the used units on June 14, 1979. This is made manifest by the notation on the pick-up form dated August 16,1979 that a “trade-in” was involved.
Why did defendant pick up the machines in August if no trade-in was involved and no business relationship existed with plaintiff at that time, as it asserts herein? A finding that a trade-in occurred, as intended by the parties, must be reached.
Defendant further relies upon the principle that, in any case, it properly rejected the traded in goods (see Uniform Commercial Code, § 2-602).
It would appear, however, that defendant’s subsequent action in repairing the two used units was inconsistent with plaintiff’s ownership and constituted acceptance (Uniform Commercial Code, § 2-606, subd [1], par [c]). This is *596 especially so since defendant claims that the machines were not working when they were picked up in August.
By continuing repairs after rejection, as here, defendant demonstrated its acceptance. Accordingly, the first affirmative defense, insofar as it relies upon the Uniform Commercial Code, must be stricken.
The second affirmative defense refers to the difference in weight between the two used machines and the weight which plaintiff’s vice-president allegedly told defendant’s sales representative. This court finds that plaintiff did not make a knowingly false and fraudulent representation as to the machines’ weight, especially in view of the on-the-spot inspection and evaluation by defendant. That defense is dismissed.
The third affirmative defense rests upon the alleged failure of plaintiff to offer the used trucks for trade-in on June 14, 1979 when the new unit was delivered. As mentioned above, this court finds that a fair preponderance of the credible evidence indicates otherwise. The court also notes that the defendant’s truck driver was not called as a witness to refute the testimony by plaintiff that the driver refused to take the machines.
Defendant further asserts that when the used units were inspected in August, 1979 they were not in operating condition and required extensive repairs. That contention requires two possible results: (1) that the machines depreciated by 57% in three months, or (2) that defendant’s sales representative failed in his appraisal. On either assumption, this court finds that upon a fair preponderance of the credible evidence defendant has not met its burden of proving the lesser value. The third affirmative defense is dismissed.
The failure of defendant to pick up the used units within a reasonable period of time must weigh against it if depreciation in fact occurred.
“What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action” (Uniform Commercial Code, § 1-204, subd [2]). In the circumstances here, this court finds that three months was not reasonable.
*597 In any event, this court does not accept the notion that depreciation occurred. If the value of the goods in August was less than originally established in May, defendant must be found to have assumed the risk attendant upon a faulty examination of the units in May or a delayed examination in August brought about by its own failure to pick up the machines (see Uniform Commercial Code, §2-316, subd [3], par [b]).
Section 2-316 (subd [3], par [b]) provides, as follows: “When the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him”.
In this case, the defendant buyer is really a merchant who has proposed a trade-in allowance on the main transaction.
It would seem that when the buyer is such a professional in the field, the foregoing provision should be strictly applied. (See Uniform Commercial Code, §2-104.)
Where, as here, the buyer of trade-in goods inspects them prior to purchase and thereafter fails to pick them up for three months, it should not be able to rely upon the rejection provisions of the Uniform Commercial Code. Moreover, its subsequent repair of the goods demonstrates acceptance under the statute.
Accordingly, judgment for plaintiff in the sum of $6,300, with interest from August 16, 1979. The counterclaim is dismissed.